UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| THROUGHPUTER, INC., | |
| Plaintiff, | C.A. No. 1:25-cv-01623 |
| v. | **JURY TRIAL DEMANDED** |
| AMAZON WEB SERVICES, INC., | |
| Defendant. | |

**PLAINTIFF THROUGHPUTER, INC.'S COMPLAINT**

Plaintiff ThroughPuter, Inc. ("Plaintiff" or "ThroughPuter") files this Complaint and demand for jury trial seeking relief from patent infringement of the claims of U.S. Patent Nos. 8,561,078; 8,789,065; 10,318,353; 10,133,599; and 10,310,902; (collectively, the "Patents-in-Suit" or "Asserted Patents") by Amazon Web Services, Inc. ("Defendant" or "AWS").

## INTRODUCTION

1.      Network interface cards are hardware devices used in data centers to handle networking tasks including data packet routing to and from a host server.

2.      AWS data centers include the "AWS Nitro System," which includes "Nitro Cards." AWS states that Nitro Cards "implement all the outward-facing control interfaces used by the EC2 [(Amazon Elastic Compute Cloud)] service to provision and manage compute, memory, and storage." *See* Ex. 9 at 7. According to AWS, the "components of the AWS Nitro System deliver faster innovation, enhanced security, and improved performance for EC2 customers." *Id.* at 1.

## NATURE OF THE ACTION

3.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

4.     ThroughPuter brings this action to halt Amazon's infringement of its rights under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*., which arise under U.S. Patent No. 8,561,078 (Ex. 1, "the '078 patent"); U.S. Patent No. 8,789,065 (Ex. 2, "the '065 patent"); U.S. Patent No. 10,318,353 (Ex. 3, "the '353 patent"); U.S. Patent No. 10,133,599 (Ex. 4, "the '599 patent"); and U.S. Patent No. 10,310,902 (Ex. 5, "the '902 patent").

## THE PARTIES

5.     Plaintiff ThroughPuter, Inc. is a Delaware corporation having a principal place of business at 201 N Union St #110, Alexandria, VA 22314. Plaintiff owns over 50 issued domestic and foreign patents and pending applications protecting its products, services and technologies. ThroughPuter's President, Mark Sandstrom, is the named inventor on each of such patents and applications.

6.     Plaintiff has been a member of The College of William & Mary's Launchpad business incubator, also known as the Alan B. Miller Entrepreneurship Center.

7.     Plaintiff has developed and continues to develop various products and services, including i) Estimator™, a machine learning Application Specific Processor (ASP)-as-a-service offering of the ThroughPuter Platform-as-a-Service (PaaS) project, and ii) Grafword™, an artificial intelligence (AI) powered, graphical authentication service that is a pilot application of the Estimator™ machine learning microservice.

8.     Estimator™ provides a streaming machine learning (ML) microservice, to support AI applications in unpredictably changing operating environments. Estimator™ allows its prediction models and logic parameters to be adjusted continuously while the microservice is in operation, such that its predictions will stay tuned-in to the prevailing reality of its operating environment, as that may evolve over time or even change abruptly. An International Search

Report recently conducted by the International Searching Authority under the Patent Cooperation Treaty concluded that this technology is patentable. A beta version of the Estimator™ application programming interface is currently commercially available for 3rd party developer subscription at www.estimatorlab.com.

9.      Grafword™ provides graphic based high-security password generation and authentication, such that the level of authentication challenge is adjusted according to a level of deviation of a given user's online session attributes from what is expected for the given username. Grafword™ thus provides both high security as well as, for the authentic users, convenience in online authentication. An International Search Report recently conducted by the International Searching Authority under the Patent Cooperation Treaty also concluded that this technology is patentable. A beta version of Grafword™ is used for Estimator™ account creation and login: https://estimatorlab.com/landing.

10.      Both Estimator™ and Grafword™ have the potential to change the space in which they are offered due to the advantages provided by ThroughPuter's claimed inventions such as increased throughput and low latency.

11.      On information and belief, Defendant is a Delaware corporation with a principal address of 410 Terry Avenue North, Seattle, Washington 98109 and is a subsidiary of Amazon.com, Inc. On information and belief, AWS has a regular and established place of business located at 11501 Alterra Pkwy, Austin, Texas 78758. Defendant is registered to do business in Texas and may be served via its registered agent at Corporation Service Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701, and at its regular place of business, or anywhere that it may be found.

12.     On information and belief, Defendant developed, sold, and offered to sell products and services throughout Texas, including in this judicial district, and introduced products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in Texas and this judicial district.

## JURISDICTION AND VENUE

13.     This is an action for patent infringement which arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

14.     This Court has subject matter jurisdiction at least under 28 U.S.C. §§ 1331 and 1338.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) because Defendant has committed acts of infringement and has a regular and established place of business in this District.

16.     This Court has personal jurisdiction over AWS in this action because AWS has committed acts of infringement within this District giving rise to this action, has a regular and established place of business in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction over AWS would not offend traditional notions of fair play and substantial justice. AWS, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products and/or services in Texas and the Western District of Texas, regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in Texas. AWS maintains regular and established places of business throughout Texas and in this District, including offices housing, on information and belief, hundreds of employees at The Domain in

Austin, a fulfillment center in the Metric Center in Austin, and numerous hubs throughout Texas and this District. AWS has over 89,000 employees in Texas. *See* Ex. 10.

17.    AWS builds and tests hardware at its labs, including one in Austin, Texas. *See* Ex. 11. Specifically, a specialist microelectronics company, which AWS acquired in 2015 named Annapurna Labs, designs, tests, and builds AWS's own family of custom chips and accelerators in Austin, Texas, which include the AWS Nitro Cards, the accused products in this suit. *See* Ex. 9 at 2 (AWS Nitro Cards are "[h]ardware devices designed by AWS"). According to AWS, "[o]n the outskirts of Austin, Texas, lies Annapurna Labs—a combination of offices, workshops, and even a mini 'data center'—where Amazon Web Services (AWS) engineers are designing the future of computing." Ex. 11. "Prior to the acquisition, Annapurna Labs and AWS worked together on the production of next-generation hardware AWS Nitro and its supporting hypervisor. Just over a decade later, Nitro is essential to every AWS server. The technology is the foundation of EC2 instances, enables AWS to innovate faster, further reduce cost for customers, and deliver increased security." *Id.* On information and belief, AWS commits acts of infringement in this District, including by, for example, making, using, selling, and offering for sale the AWS Nitro System that embodies the inventions claimed in the Patents-in-Suit.

18.    Defendant has substantial business contacts within this District and has purposefully availed itself of the privileges and benefits of the laws of the State of Texas.

## BACKGROUND

19.    This case involves ThroughPuter's patented cloud computing, computing acceleration, network acceleration, and related technologies, which were developed starting in 2010.

20.     As of that time, advancements in computing technologies had generally fallen into two categories. First, in the field conventionally referred to as high performance computing, the main objective has been maximizing the processing speed of a given computationally intensive program running on dedicated hardware. In this field, speed was traditionally achieved by assigning a combination of separate parallel processors to all work on the same program simultaneously. Second, in the field conventionally referred to as utility or cloud computing, the main objective has been to most efficiently share a given pool of computing hardware resources among a large number of client application programs.

21.     Thus, in effect, one branch of computing innovation has been seeking to effectively use a large number of parallel processors to accelerate execution of a single application program by parallelizing its processing across a maximum possible number of processors. At the same time, another branch of computing innovation has been seeking to share a single pool of computing capacity among a large number of application programs to optimize utilization of processing capacity. The former efforts pursue maximizing processing speed of a single program. The latter efforts pursue maximizing utilization of processing capacity.

22.     As of the time of ThroughPuter's pioneering patent filings starting in 2011, there had not been major synergies between the effort to increase processing speed of a single program on the one hand and maximizing processing capacity utilization on the other. Indeed, pursuing one of these traditional objectives often happened at the expense of the other, placing the two objectives in tension with each other.

23.     For instance, while dedicating an entire parallel processor based (super) computer to each individual application would increase processing speed of the individual programs, it would also cause severely sub-optimal computing resource utilization, as much of the capacity

would be idle much of the time. On the other hand, while seeking to improve utilization of computing systems by sharing their processing capacity among a number of applications would lead to enhanced resource utilization, it also tended to slow down processing of individual programs. As such, the overall cost-efficiency of computing was not improving as much as improvements toward either of the two traditional objectives would imply: traditionally, increases in processing speed came at the expense of system utilization efficiency, while overall system utilization efficiency maximization came at the expense of individual application processing speed.

24.     The foregoing tension was exacerbated by the fact that even mainstream application performance requirements were increasingly exceeding the processing throughput achievable from a single CPU core, e.g., due to the practical limits being reached on the CPU clock rates. This created an emerging requirement for intra-application parallel processing (at ever finer grades) even for mainstream programs in order to pursue satisfactory processing speeds, while these programs were to be increasingly hosted on cloud computing platforms where the processing resources would be shared among programs of multiple clients.

25.     These internally parallelized and/or pipelined (concurrent) enterprise and web applications would ultimately be largely deployed on shared cloud computing infrastructure by entities such as Defendant using the technologies patented, pioneered and promoted by ThroughPuter.

26.     Given the foregoing, there existed a need as of 2011 for supporting a large number of concurrent applications on shared parallel processing resource pools. This then-existing need for a new parallel computing architecture could be met by a system that enabled increasing the speed of executing application programs (including through execution of a given application in

parallel across multiple processor cores and/or using hardware accelerators) while at the same time improving the utilization of the available computing resources. At the same time, work traditionally performed by CPUs could be offloaded to specialized hardware to accelerate various functions, including networking and compute.

27.    To address these problems, ThroughPuter developed hardware implemented resource management functionality including a scheduler, placer, inter-task communications and input/output system for use with multicore processor arrays that can optionally be dynamically shared among multiple concurrent applications. ThroughPuter's technology provided a cloud computing solution that enables accelerated processing speeds, performed in hardware, across multiple application programs while at the same time optimizing processing resource utilization.

28.    ThroughPuter's technology results in optimized on-time processing throughput across the programs sharing an array of manycore processors. The effect for the client or end user of an accelerated service is increased processing speed and reduced cost base for delivering the application service, such that it becomes economically feasible for cloud service providers to support a range of performance intensive applications even without charge to end-users.

29.    In recognition of ThroughPuter's innovative achievements, ThroughPuter's Mark Sandstrom was invited to speak at various high performance and cloud computing conferences starting in 2012. GigaOm selected ThroughPuter as one of eleven finalists to present at Launchpad 2012 in San Francisco, California. That same year, ThroughPuter was invited to present certain of its technology-based PaaS approach at the high-performance computing start-up showcase at the Supercomputing 2012 conference ("SC12") in Provo, Utah.

30.     ThroughPuter's novel manycore fabric led to industry recognition of ThroughPuter and its technology. For example, in January 2013, ThroughPuter was invited to publish an article in the Cloud Computing Journal, discussing PaaS based on novel manycore fabric. *See* Ex. 6.

31.     In addition, in September 2014, Mr. Sandstrom presented at the FPGAworld Conference in Stockholm, Sweden, on the topic of *Hardware Implemented Scheduler, Placer, Inter-Task Communications and IO System Functions for Manycore Processors Dynamically Shared among Multiple Applications*. *See* Ex. 7.

32.     By the time of the 2014 FPGAworld Conference, ThroughPuter had already been granted at least a dozen U.S. and United Kingdom patents protecting techniques enabling the advantages of its Dynamic Parallel Execution Environment™ (DPEE).

33.     The following year, ThroughPuter was invited to present at the 2015 HPC Advisory Council Conference in Spain on the topic of executing multiple dynamically parallelized programs on dynamically shared cloud processors. A copy of the presentation is attached as Exhibit 8.

## DEFENDANT'S INFRINGEMENT OF PLAINTIFF'S PATENTS

34.     Defendant has been and is presently infringing, and will continue to infringe, the Asserted Patents in this District and elsewhere in the United States by, among other things, making, using, selling, offering for sale and/or importing the AWS Nitro System, including Nitro Cards.

35.     Defendant directly infringes the Asserted Patents pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, or both.

36.     Defendant also indirectly infringes the Asserted Patents by encouraging, instructing, directing, and requiring others, including its customers, purchasers, users, and developers, to use the processing systems of the Asserted Patents, either literally or under the doctrine of equivalents, or both.

## DEFENDANT'S INFRINGING NITRO SYSTEM

37.     The AWS Nitro System includes purpose-built Nitro Cards, the Nitro Security Chip, and the Nitro Hypervisor. Ex. 9 at 7. "Nitro Cards are dedicated hardware components with powerful 64-bit processing capabilities and specialized Application Specific Integrated Circuits ('ASICs') that operate independently from the system main board that runs all customer compute environments, including code and data processing operations." *Id.* (emphasis removed). "The Nitro Cards implement all the outward-facing control interfaces used by the EC2 service to provision and manage compute, memory, and storage. They also provide all I/O interfaces, such as those needed to provide software-defined networking, Amazon EBS storage, and instance storage. This means that all the components that interact with the outside world of the EC2 service beyond the main system board—whether logically inbound or outbound—run on self-contained computing devices which are physically separate from the system main board on which customer workloads run." *Id.* "In addition to the Nitro Controller, some systems use additional specialized Nitro Cards to perform specific functions. These subordinate Nitro Cards share the same SoC [(system on a chip)] and base firmware designs as the Nitro Controller. These Nitro Cards are designed with additional hardware and specialized firmware applications as required for their specific functions. These include, for example, the Nitro Card for VPC, the Nitro Card for EBS, and the Nitro Card for Local NVMe Storage." *Id.* at 11. Defendant's Nitro Cards are the products accused of infringement in this Complaint ("Accused Products" or "accused Nitro Cards").[1]

---

[1] All Nitro Cards are Accused Products, and discussions in the following Counts describing infringement of the Patents-in-Suit by a particular Nitro Card apply to all of them because "Nitro Cards share the same SoC and base firmware designs as the Nitro Controller." Ex. 9 at 11. Plaintiff expressly reserves the right to expand, modify, or otherwise alter its identification of Accused Products as this case progresses.

38.     The accused Nitro Cards are connected to a host through the host's PCIe connection and to the AWS data center network through an Ethernet connection, each connection providing multiple input ports to the accused Nitro Card. Ex. 9 at 7; Ex. 14 at 15, 46–49. Data packets received through the PCIe inputs on the Nitro Card from the host for transmission are processed by the Nitro Card for sorting into Tx ring queues, then transmitted through the Ethernet connection through the AWS datacenter network to other host servers and network memory/storage devices. Ex. 14 at 15, 36, 46–49. Data packets received through the Ethernet inputs on the Nitro Card over the AWS datacenter network from remote host or network memory/storage devices are processed by the Nitro Card for sorting into Rx ring queues and sent through the PCIe interface to the local host. Ex. 14 at 15, 46–49, 52; *see also* Ex. 9 at 7. The accused Nitro Cards provide the processing required to route data packets to their correct destinations, either on the local host or on remote hosts or network memory/storage devices, and for the data packets to be successfully processed by the receiving host. Ex. 9 at 7.

39.     The accused Nitro Cards include SoCs with specialized hardware and an array of processing cores (referred to herein as the "Nitro cores") for pipeline data packet processing and other functions. *See* Ex. 15 at 17 (the accused Nitro Cards "are composed of both some kind of standard capabilities something like an ARM processor a general-purpose computer as well as custom silicon for certain types of specific uses and specific accelerations so [they are] systems on a chip that have kind of both of those elements."); Ex. 9 at 8; Ex. 12 at 5; Ex. 13.

40.     AWS data centers offload system control tasks for storage and virtualization to the accused Nitro Cards, tasks that would otherwise use host computing resources, and to accelerate network and storage input/output (I/O) functions. Ex. 17 at 2–3. The accused Nitro Cards include hardware and software components to implement the "ENA (Elastic Network Adapter)[, which]

uses multiple receive (Rx) and transmit (Tx) queues (ENA queues) to improve network performance and scalability on EC2 instances. These queues efficiently manage network traffic by load-balancing sent and received data across available queues." Ex. 16 at 2499. The accused Nitro Cards provide load balancing across multiple paths along the data center network with congestion control algorithms to distribute network traffic uniformly across multiple paths. *See generally* Ex. 19. The accused Nitro Cards also implement the AWS scalable reliable datagram (SRD) network transport protocol used for high performance computing (HPC) and machine learning (ML) applications. Ex. 16 at 2441, 2505; Ex. 19.

41.     The accused Nitro Cards include specialized purpose-built processors and Nitro cores to accelerate the rate of data packet processing once a network connection is established. *See id.* at 2495 ("EC2 instances built on the Nitro system have hardware acceleration capabilities that enable faster packet processing, as measured by packets per second (PPS) throughput rates. When a Nitro card performs the initial evaluation for a new flow, it saves information that's the same for all packets in the flow, such as security groups, access control lists, and route table entries. When it processes additional packets for the same flow, it can use the saved information to reduce overhead for those packets."); *id.* at 2500–01. The accused Nitro Cards provide networking and storage capabilities in part by processing data packets received and transmitted by the host to determine how to route them and to modify them accordingly to achieve the determined routing. Ex. 14; Ex. 16 at 2495; Ex. 18 at 11–19. "When a Nitro card handles an inbound network packet, it evaluates the packet against stateful firewall rules and access control lists. It tracks the connection, meters it, and performs other actions as applicable. Then it forwards the packet to its destination on the host CPU. . . . When a Nitro card handles an outbound network packet, it looks up the remote interface destination, evaluates various VPC functions, applies rate limits, and

performs other actions that apply. Then it forwards the packet to its next hop destination on the network." Ex. 16 at 2496.

42.     Several sources identify the Nitro cores as including Arm cores. *See* Ex. 15 at 17; Ex. 12 at 5 ("The next step was to move the data plane and the control plane onto the Nitro cards, using the Arm cores inside."); Ex. 13 at 4 ("Amazon Web Services has multi-core Arm CPUs on its 'Nitro' DPUs, which virtualize all network and storage for AWS server nodes"). In the accused Nitro Cards, cores are distributed among nodes in an SoC on-chip network (referred to here as the "SoC Network" on the accused Nitro Cards) that provides connections between cores in the array and the rest of the chip, including SoC system level cache. *See, e.g.*, Ex. 20. The accused Nitro Cards include Arm-designed cores and an on-chip network. The Arm cores (or the functional equivalent, either one referred to here as a "Nitro core") include separate L1 data and instruction caches, a larger L2 cache, and a shared, system-level cache ("SoC system level cache"). Ex. 20. The Nitro cores are connected to the shared system cache through a low-latency direct-connect interface to the SoC Network, managed by hardware controllers associated with the Nitro cores. *Id.*

43.     Each accused Nitro Card in the AWS Nitro System is a system or platform. Alternatively, multiple accused Nitro Cards may work together to form a system or platform. For example, a first Nitro Card receives data packets from its host (e.g., through a PCIe interface), evaluates and transforms the packets (in its specialized packet processing hardware and Nitro core array), and transmits the transformed packets to a remote host (e.g., over an Ethernet interface). A second Nitro Card at the remote host receives the packets (e.g., through an Ethernet interface) and transforms them with its packet processing engine before transmitting them to its own local host (e.g., through a PCIe interface). *See* Ex. 18 at 11–20. Each packet processing engine (one on the

sending Nitro Card and another on the receiving Nitro Card) executes a set of packet processing programs. *Id.*

44.    Each copy of a particular program processing a particular data packet on a specified core or set of cores in the Nitro core array on the accused Nitro Cards is an example of a program instance. Each program includes one or more processing steps, which are examples of tasks as understood by a skilled artisan. A specific core performing a specific task on a specific data packet would be understood to be a non-limiting example of a task instance. Thus, in an example, a program instance may comprise one or more task instances. In an example, those tasks instances are hosted at processing stages in a packet processing program instance "offloaded" to the accused Nitro Cards. Those tasks would have otherwise been performed in software on the host server CPUs, reducing its computing capacity and increasing its power consumption.

## COUNT ONE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,561,078

45.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

46.    On October 15, 2013, the United States Patent and Trademark Office duly and legally issued the '078 patent, titled "Task Switching and Inter-Task Communications for Multi-Core Processors." *See* Ex. 1.

47.    Mark Sandstrom is the sole and true inventor of the '078 patent.

48.    ThroughPuter owns all right, title, and interest to and in the '078 patent.

49.    On information and belief, Defendant has and continues to infringe one or more claims of the '078 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the accused Nitro Cards.

50.    The accused Nitro Cards meet all the limitations of at least claim 1 of the

'078 patent. Claim 1 is representative of the claims infringed by Defendant and recites:

1. A data processing system comprising:

an array of processing cores for processing a set of software programs
configured to run on the data processing system, with each software program
among the set of software programs comprising its list of tasks to be processed;

a hardware logic module, referred to as a controller, for repeatedly assigning
individual processing cores of the array of processing cores to process
individual tasks of each software program among the set of software programs;

a memory providing task-specific memory segments; and

a hardware logic module, referred to as a cross-connect, for connecting the array
of processing cores and the task-specific memory segments of the memory,
wherein the controller configures at least one of the following: (a) at least one
given task-specific multiplexer among a set of task-specific multiplexers within
the cross-connect to connect a processing core of the array of processing cores
to such a task-specific memory segment that is specific to the same task as the
given task-specific multiplexer, and (b) at least one given core-specific
multiplexer among a set of core-specific multiplexers within the cross-connect
to connect a task-specific memory segment to such a core of the array of
processing cores that the given core-specific multiplexer is specific to.

51.    The accused Nitro Card is a **data processing system**.[2]

52.    The accused Nitro Card includes "a system-on-a-chip" (SoC) that provides data

packet processing, among other functions, so the Nitro Card is an example of a **data processing**

**system**. *See, e.g.*, Ex. 15 at 17; Ex. 9 at 8; Ex. 12 at 5; Ex. 13.

53.    The accused Nitro Card includes **an array of processing cores for processing a**

**set of software programs configured to run on the data processing system, with each software**

**program among the set of software programs comprising its list of tasks to be processed**.

---

[2] While ThroughPuter treats the preamble of each claim as if it were a limitation of the claim for
purposes of this Complaint, ThroughPuter does not concede that the preambles are limiting.

54.     The accused Nitro Cards each have an array of Nitro cores (**array of processing cores**) handling, e.g., data packet processing as part of a packet processing pipeline. Ex. 12 at 5; Ex. 13 at 4; Ex. 15 at 17. The Nitro cores process data packets according to specific processing instructions (the collection of tasks that are executed according to the instructions being an example of **software programs configured to run on the data processing system**). *See, e.g.*, Ex. 12 at 5; Ex. 13 at 4; Ex. 15 at 17; Ex. 20. Each of the Nitro cores configured for operation in a data packet processing pipeline is programmed to perform an assigned packet processing operation (**task**) on the data packets. Different packet flows require different packet processing operations, thus requiring differently configured cores for processing. *See* Ex. 18 at 54 (showing Nitro Processing by "unique" "flow hashes" for "independent [] assignment" of data to a "queue" and Nitro processor). Examples of the tasks performed by the Nitro cores on the packets include complex or stateful **tasks** such as TCP encapsulation, application-level gateways, multi-packet NAT, telemetry and tracking, metering, system-wide load balancing and flow control. A series of tasks (**list of tasks**) performed on a given packet flow comprises a **program**. There are many different packet flows needing different combinations of packet processing tasks and collectively these operations are part of a **set of software programs** offloaded to the accused Nitro Card hardware for processing. *Id*.

55.     The accused Nitro Card includes **a hardware logic module, referred to as a controller, for repeatedly assigning individual processing cores of the array of processing cores to process individual tasks of each software program among the set of software programs.**

56.     Specialized hardware (**hardware logic module, referred to as a controller**) on the accused Nitro Card processes the 5-tuple data packet headers and directs data packets to flow-

specific buffers, each of which requires a specific packet processing by the Nitro cores based on the nature of the packets in the flow (performed by a specific program comprising a set of individual packet processing tasks). *See* Ex. 18 at 54 (showing Nitro Processing by unique "flow hashes" for "independent [] assignment" of data to a "queue" and Nitro processor) and 71 (showing Nitro Processor cycle time allotted between instances); Ex. 16 at 2499. The input buffers are repeatedly polled by controller hardware associated with each Nitro core. Upon finding data in the program-specific input buffer, the controller hardware connects the packet to a Nitro core **to process individual tasks of each software program**. Each Nitro core in the accused Nitro Card polls an input buffer, a segment of the SoC system level cache, that is specific to that core at least during the pendency of a given packet flow, and the core processes the data packets in its associated input buffer according to that core's processing instructions. Ex. 18 at 54. The process is repeated for each data packet entering that core's input buffer The **assigning processing cores** occurs **repeatedly** at least because cores are assigned by the packet processing **controller** for processing packet flows and because old packet flows terminate and new packet flows initiate over time. (**repeatedly assigns individual processing cores of the array of processing cores to process individual tasks of each software program**).

57.    The accused Nitro Card includes **a memory providing task-specific memory segments**.

58.    In the accused Nitro Card, the SoC system level cache (**memory**) is segmented into input buffers, with each input buffer receiving a discrete packet flow and thus containing packets that require the same type of processing. *See* Ex. 18 at 54 (showing Nitro Processing by unique "flow hashes" for "independent [] assignment" of data packet flow to a "queue" and Nitro processor). Each input buffer is thus **specific** to a particular processing **task** (or series of tasks)

required for that packet flow. Ex. 18 at 14; Ex. 16 at 2499. The SoC system level cache with task-specific queues is **a memory providing task-specific memory segments.** Ex. 18 at 14.

59.     The accused Nitro Card includes **a hardware logic module, referred to as a cross-connect, for connecting the array of processing cores and the task-specific memory segments of the memory, wherein the controller configures at least one of the following: (a) at least one given task-specific multiplexer among a set of task-specific multiplexers within the cross-connect to connect a processing core of the array of processing cores to such a task-specific memory segment that is specific to the same task as the given task-specific multiplexer, and (b) at least one given core-specific multiplexer among a set of core-specific multiplexers within the cross-connect to connect a task-specific memory segment to such a core of the array of processing cores that the given core-specific multiplexer is specific to.**

60.     In the accused Nitro Card, the input buffers in the SoC system level cache (**task-specific memory segments**) are connected to the Nitro cores (**array of processing cores**) by hardware logic in the SoC network (**hardware logic module** or **cross-connect**) to the appropriate Nitro **cores in the array** running the program tasks such as complex or stateful **tasks** such as TCP encapsulation, application-level gateways, multi-packet NAT, telemetry and tracking, metering, system-wide load balancing and flow control. *See* Ex. 18 at 14 (showing the accused Nitro Card "Hash on 5-tuple" for "Queue Assignment" resulting in the Nitro "Processor Assignment."); Ex. 16 at 2499. Input buffers connected by the SoC network to the core identified for that packet flow. Ex. 9 at 26 ("Within EC2 Nitro, instances are allocated to dedicated cores for the lifetime of the instance except on burstable instance types where microarchitectural state is flushed when the core is rescheduled."). The **multiplexer** hardware in the SoC network connects those multiple input buffers to the particular processing core. The Nitro cores are interconnected to each other, to

the Nitro Card acceleration hardware, and to the system level cache through the SoC network hardware, which provides the physical multiplexed connections between a Nitro core and input buffers in the SoC system level cache. *See id*. The packet processing pipeline provides data packets to the system level cache, segmented into input buffers (**task-specific memory segments**), which the Nitro cores connect to through the SoC network hardware (**cross-connect**), each Nitro core being able to access all of the memory segments in the system level cache through the SoC network, with multiple input buffers mapped to each Nitro core being a multiplexing operation performed by the SoC network hardware (i.e., **one given task-specific multiplexer among a set of task-specific multiplexers within the cross-connect connects a processing core of the array of processing cores to such a task-specific memory segment that is specific to the same task as the given task-specific multiplexer**).

61.    With reference to sub-element (b): The SoC network hardware on the accused Nitro Card is configured to connect all input buffers requiring a particular processing task (**task-specific memory segments**) to each core in the Nitro core array configured (or to be configured) to handle that processing task. Each such core thus has at least one associated multiplexing element (**core-specific multiplexer**) that connects the input buffers to particular Nitro cores for processing. The SoC network hardware (**cross-connect**) configures the **core-specific multiplexers** to connect the input buffers in the system level cache to the appropriate Nitro cores.

62.    The above allegations of infringement are preliminary and are therefore subject to change.

63.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '078 Patent.

19

64.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '078 patent by no later than the filing of this Complaint.

65.    At least since the date that Defendant learned of the '078 patent, Defendant's infringement has been deliberate and willful.

66.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '078 patent, Defendant's infringement.

67.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '078 patent.

68.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '078 patent.

69.    Defendant has directly infringed and continues to directly infringe the '078 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the accused Nitro Cards or components and services thereof.

70.    Defendant's infringement of the '078 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

71.    Defendant's infringement of the '078 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

72.     Defendant's infringement of the '078 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '078 patent. Defendant's continuing infringement of the '078 patent after the filing of this Complaint is particularly egregious.

73.     Defendant's infringement of the '078 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

74.     The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count One without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT TWO
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,561,078

75.     ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

76.     Defendant knew it was infringing the '078 patent by no later than the filing of this Complaint.

77.     In addition to directly infringing the '078 patent, as discussed above with respect to Count One, Defendant knew or was willfully blind to the fact that it was inducing infringement of the '078 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to directly infringe by using the Accused Products in the United States.

78.     Defendant knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '078 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '078 patent with the AWS Nitro System, as described above. Such instructions and encouragement included, but were not limited to, advising third parties to use the Defendant in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the AWS Nitro System, by advertising and promoting the use of the AWS Nitro System in an infringing manner, and distributing development kits, development Amazon Machine Images, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the AWS Nitro System must be used. *See, e.g.*, Exs. 9, 14–19.

79.     Defendant has had actual knowledge of the indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

80.     Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '078 patent.

81.     Defendant's infringement of the '078 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

82.     Defendant's infringement of the '078 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

83.     Defendant's infringement of the '078 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and

Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '078 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

84.    Defendant's infringement of the '078 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

85.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Two without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

**COUNT THREE**
**DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,789,065**

86.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

87.    On July 22, 2014, the United States Patent and Trademark Office duly and legally issued the '065 patent, titled "System and Method for Input Data Load Adaptive Parallel Processing." *See* Ex. 2.

88.    Mark Sandstrom is the sole and true inventor of the '065 patent.

89.    ThroughPuter owns all rights, title, and interest to and in the '065 patent.

90.    On information and belief, Defendant has and continues to infringe one or more claims of the '065 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the accused Nitro Cards.

91.     Claim 1 of the '065 patent is representative of the claims infringed by Defendant and recites:

1.   A system for input data load adaptive processing of a set of software programs sharing a manycore processor, with each of said programs having one or more instances, and with said instances of the programs referred to as program instances, the system comprising:

a collection of hardware input data ports of the processor, where each port of the collection is shared dynamically among data packets for the program instances;

an array of hardware buffers, where each buffer of the array is specific to an individual destination program instance among said program instances;

a logic subsystem for dynamically, at individual packet granularity, demultiplexing input data packets from said input ports to said destination program instance specific buffers based on a destination program instance indication of any given one of the packets by overhead information of the given packet;

a logic subsystem for monitoring volumes of data packets at the program instance specific buffers and for periodically assigning processing cores of the processor among individual program instances among said program instances at least in part based on the respective monitored volumes of packets at the program instance specific buffers; and

a logic subsystem for multiplexing data packets dynamically from the destination program instance specific buffers to the processor cores so that, to any given one of the processor cores, packets are multiplexed from the buffers that are specific to the program instance that the logic subsystem for assigning has presently assigned to the given processor core,

wherein, in case the system is a part of a multi-stage group of two or more of the manycore processors, at a given one of such processors, the logic subsystem monitoring volumes and for periodically assigning the processor cores of the given processor inserts an identification of a destination program for a data packet passed from the given processor to other processors of the group, to provide isolation between different programs among the set.

92.    The accused Nitro Card is a **system for input data load adaptive processing of a set of software programs sharing a manycore processor, with each of said programs having one or more instances, and with said instances of the programs referred to as program instances.**

93.    The accused Nitro Card includes specialized packet processing hardware and an array of Nitro Cores for processing data packets. Ex. 18 at 14; Ex. 16 at 2499. The Nitro cores handling data packet processing are **processing a set of software programs** (for example, executing a series of complex or stateful **tasks** such as TCP encapsulation, application-level gateways, multi-packet NAT, telemetry and tracking, metering, system-wide load balancing and flow control, a series of tasks performed on a given packet flow being a **program**). Ex. 16 at 2499. The Nitro core array includes multiple cores for simultaneously handling **one or more program instances** within packet processing programs. See Ex. 18 at 70 (showing the accused Nitro Card handling multiple **program instances** with "[C]ycle [T]ime [A]llotted for [E]ach Nitro [core] [P]rocessor.").

94.    The **software programs sharing a manycore processor** are a set of software packet processing programs running on the Nitro Card (**manycore processor**). *Id.* The set of tasks performed in a **program instance** is determined in part by the packet flow, which typically includes packets of a given type. That at least in part dictates the packet processing tasks to be performed on the packets and the set of tasks is generally different for different packet flows. Stated differently, different types of data packets (from different packet flows) generally have different tasks performed on them and are therefore routed to different processing **program instances** (which represent a collection of processing task instances) by data packet routing to the program instance specific input buffers.

95.    The accused Nitro Card provides **load adaptive processing of a set of software programs sharing a manycore processor.**

96.    The accused Nitro Card handles multiple flows simultaneously, each requiring processing by the Nitro Card and each being allotted a share of cycle time for the Nitro Processor (Nitro cores in the Nitro **manycore processor**). *See* Ex. 18 at 70. The Nitro Card handles multiple instances by dividing the Nitro processing resources (e.g., the N1 core array) among the instances, and providing some instances with additional Nitro processing resources when needed for an allotment of time through a credit-based system allowing increased processing bandwidth as needed for an instance until the credit allotment for that instance is exhausted. *Id.* at 55–70 (showing "multiple flows … at the instance level" (the flows of data packets requiring processing including tasks that comprise the **set of software programs sharing a manycore processor**) and discussing the accumulation and consumption of bandwidth credits.) This is an example of **load adaptive processing** at least because additional bandwidth is allotted to instances requiring extra processing (i.e., an extra processing **load**). *Id.*

97.    The accused Nitro Card includes **a collection of hardware input data ports of the processor, where each port of the collection is shared dynamically among data packets for the program instances.**

98.    The accused Nitro Card includes multiple inputs, which are **a collection of hardware input data ports of the processor** that receive inbound **data packets**. The accused Nitro Cards are connected to a host through the host's PCIe interface (**a collection of hardware data input ports of the processor**) and to the AWS data center network through an Ethernet connection (also **hardware data input ports of the processor**), each connection providing multiple inputs to the accused Nitro Card. Ex. 9 at 7; Ex. 14 at 15, 46–49. Data packets received

through the PCIe inputs on the Nitro Card from the host for transmission are sent to input buffer segments of the SoC system level cache for Nitro core processing, processed by the Nitro cores, sent to Tx queues, then transmitted through the Nitro Card Ethernet connection through the AWS datacenter network to other host servers and network memory/storage devices. Ex. 14 at 15, 36, 46–49. Data packets received through the Ethernet inputs on the Nitro Card over the AWS datacenter network from remote host or network memory/storage devices are sent to input buffer segments of the SoC system level cache for Nitro core processing, processed by the Nitro cores, sent to Rx queues, and sent through the PCIe interface to the local host. Ex. 14 at 15, 46–49, 52; *see also* Ex. 9 at 7. Streams of individual **data packets** flow continuously into each input port on a packet-by-packet basis (**shared dynamically among data packets**) and are then routed by the Nitro Card to program instance specific input buffers, which are program-specific segments of the SoC system level cache memory for holding data packets requiring that specific program (**data packets for the program instances**). Ex. 9 at 7.

99.    The accused Nitro Card includes **an array of hardware buffers, where each buffer of the array is specific to an individual destination program instance among said program instances.**

100.    The accused Nitro Card includes a SoC system level cache segmented into input buffers for the Nitro cores. Ex. 18 at 14; Ex. 16 at 2499. Specialized packet processing hardware determines what processing is needed for each packet based on at least data packet metadata (see discussion above), then directs the packets from the pipeline flow into the input buffer segments of the system level cache designated for storing data packets (**array of hardware buffers**). Ex. 18 at 14; Ex. 16 at 2499. Each queue is specific to a specific packet flow and a distinct data packet processing program (set of packet processing tasks) for processing by the Nitro core array (**each**

**buffer of the array is specific to an individual destination program instance,** where the **destination program instance** is the specific program instance that a Nitro core is assigned to). Ex. 16 at 2499; *see* Ex. 18 at 14 (showing the accused Nitro Card "Hash on 5-tuple" for "Queue Assignment" resulting in the Nitro "Processor [core] Assignment"; each packet in a packet flow will generally have the same 5-tuple).

101.    The accused Nitro Card includes **a logic subsystem for dynamically, at individual packet granularity, demultiplexing input data packets from said input ports to said destination program instance specific buffers based on a destination program instance indication of any given one of the packets by overhead information of the given packet.**

102.    The accused Nitro Card receives multiple inputs of incoming streams of data packets through its PCIe and Ethernet inputs, and specialized packet processing hardware executes a "five tuple hash" (the packet header, or **overhead information of the given packet** that provides a **destination program instance indication**) to distribute the data packets into flow specific (and thus **program instance specific)** input **buffers**. *See* Ex. 18 at 14, 54 (Regarding input data packets, "[w]ith that five tuple, they're unique. When we hash them, we can assign them to different receive and transmit queues, that gives us that horizontal scale where we can spread those loads across multiple queues."); Ex 19 at 2499.  The SoC network includes a **logic subsystem** configured to **dynamically** "spread those [individual packet input] loads across multiple queues," which is **demultiplexing input data packets from said input ports to said destination program instance specific buffers. Individual packets** are loaded into their destination input buffers (**individual packet granularity**) which are on a per-flow basis, i.e., each destination input buffer is dedicated to a distinct packet flow and processing program (**destination program instance specific buffers**). *See* Ex. 18 at 14, 54.

103.    The accused Nitro Card includes **a logic subsystem for monitoring volumes of data packets at the program instance specific buffers and for periodically assigning processing cores of the processor among individual program instances among said program instances at least in part based on the respective monitored volumes of packets at the program instance specific buffers.**

104.    As discussed above, the accused Nitro Card includes input buffers that are **program instance specific buffers.** Ex. 18 at 14. The input buffers are sequentially and repeatedly polled by controller hardware associated with each Nitro core, which is a **logic subsystem for monitoring volumes of data packets at the program instance specific buffers.** When a packet flow is assigned to a given buffer, the controller hardware repeatedly assigns a core of the array to handle packet processing for the packet flow (**assigns processing cores** (Nitro cores) **of the processor among individual program instances**). *See* Ex. 18 at 54 (discussing independent assignment of Nitro processors for each flow). The core assignment occurs **periodically**—only when there is a packet flow assigned to the buffer and thus packets in the buffer. Further, the control hardware maintains flow symmetry. The controller applies a congestion control and fair queuing algorithms for and within the queues (**at least in part based on the respective monitored volumes of packets at the program instance specific buffers**). *Id.* at 33.

105.    The accused Nitro Card includes **a logic subsystem for multiplexing data packets dynamically from the destination program instance specific buffers to the processor cores so that, to any given one of the processor cores, packets are multiplexed from the buffers that are specific to the program instance that the logic subsystem for assigning has presently assigned to the given processor core**.

106.   The accused Nitro Card includes a SoC network (**logic subsystem for multiplexing data packets**) for controlling the connections between the input buffer segments (flow-specific queues) of the SoC system level cache (**destination program instance specific buffers**) and the Nitro **processor cores**. Ex. 18 at 14; Ex. 16 at 2499. Each **processor core** that is **assigned a program instance** (by being identified to handle a packet flow requiring certain packet processing) is configured to receive data packets for processing from any input buffer (**multiplexing data packets dynamically from the destination program instance specific buffers to the processor cores**) that holds packets that also require the same packet processing task(s) (**specific to that program instance)**. Data packets are routed by the SoC network, which includes multiplexers (in an inter-core mesh network or equivalent) to provide connections from the input buffers to each of the Nitro **processor cores**. This many queues-to-one processing core connection is a **multiplexing** operation. The foregoing is managed by SoC control hardware (**logic subsystem for assigning has presently assigned to the given processor core**). Ex. 18 at 14, 54; Ex. 16 at 2499.

107.   Multiple Nitro Cards are implemented as **a part of a multi-stage group of two or more of the manycore processors, at a given one of such processors, the logic subsystem monitoring volumes and for periodically assigning the processor cores of the given processor inserts an identification of a destination program for a data packet passed from the given processor to other processors of the group, to provide isolation between different programs among the set.**

108.   The accused Nitro Cards are configured to be used in a data center network, in which multiple Nitro Cards (**multistage group of two or more manycore processors,** with each Nitro Card including a **manycore processor**) perform packet processing for data packet

transmissions between hosts on different servers (**monitoring volumes and for periodically assigning the processor cores of the given processor inserts an identification of a destination program for a data packet passed from the given processor to other processors of the group**). *See, e.g.*, Ex. 18 at 22. "AWS has a conservative approach to EC2 tenant-isolation . . . that is designed so that customer instances can never share system resources such as L1/L2 cache or threads running on the same CPU complex" (**to provide isolation between different programs among the set**). Ex. 9 at 24. The packet processing pipeline in the first of the multiple Nitro Cards identifies a data packet for transmission over an Ethernet connection to another Nitro Card and processes the packet. Data included with the packets (e.g., metadata) indicates what processing is to be performed on the packets by the other Nitro Card (**destination program for a data packet**). *Id.*

109.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '065 patent by no later than the filing of this Complaint.

110.    At least since the date that Defendant learned of the '065 patent, Defendant's infringement has been deliberate and willful.

111.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '065 patent, Defendant's infringement, as well as the infringement of their customers and others.

112.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '065 patent.

113.    Defendant has directly infringed and continues to directly infringe the '065 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not

necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the AWS Nitro System or components and services thereof.

114.    Defendant's infringement of the '065 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

115.    Defendant's infringement of the '065 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

116.    Defendant's infringement of the '065 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '065 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

117.    Defendant's infringement of the '065 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

118.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Three without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT FOUR
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,789,065

119.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

120.    Defendant knew it was infringing the '065 patent by no later than the filing of this Complaint.

121.    In addition to directly infringing the '065 patent, as discussed above with respect to Count Three, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '065 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to directly infringe by using the Accused Products in the United States.

122.    Defendant knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '065 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '065 patent with the AWS Nitro System, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Defendant in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the AWS Nitro System, by advertising and promoting the use of the AWS Nitro System in an infringing manner, and distributing development kits, development Amazon Machine Images, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the AWS Nitro System must be used. *See, e.g.*, Exs. 9, 14–19.

123.    Defendant's indirect infringement of the '065 patent has injured and continues to injure Plaintiff in an amount to be proven at trial, but not less than a reasonable royalty.

Defendant's indirect infringement of the '065 patent has caused and is continuing to cause damage and irreparable injury to Plaintiff, and Plaintiff will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

124.    Defendant has had actual knowledge of the indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

125.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '065 patent.

126.    Defendant's infringement of the '065 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

127.    Defendant's infringement of the '065 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

128.    Defendant's infringement of the '065 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '065 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

129.    Defendant's infringement of the '065 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

130.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or

services and infringing claims in Count Four without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT FIVE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,318,353

131.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

132.    On June 11, 2019, the United States Patent and Trademark Office duly and legally issued the '353 patent, titled "Concurrent Program Execution Optimization." *See* Ex. 3.

133.    Mark Sandstrom is the sole and true inventor of the '353 patent.

134.    ThroughPuter owns all right, title, and interest to and in the '353 patent.

135.    On information and belief, Defendant has and continues to infringe one or more claims of the '353 patent, including claim 3, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the accused Nitro Cards.

136.    Claim 3 of the '353 patent is representative of the claims infringed by Defendant. Claim 3 depends on claim 1, which recites:

1.    A system for processing a set of computer program instances, comprising:

a plurality of processing stages, at least one of the plurality of processing stages comprising multiple processing cores, wherein,

each given task of a plurality of tasks of a given program instance of the set of program instances is hosted at a different stage of the plurality of processing stages as a local task of the given program instance at the respective stage, and for at least one of the multiple processing cores of a given processing stage of the plurality of processing stages, a local task of one of the program instances is assigned as an active task instance for execution for a period of time; and

a group of multiplexers each connecting inter-task communications (ITC) data to a respective stage of the plurality of processing stages, wherein at least one multiplexer of the group of multiplexers is a hardware resource dedicated to the local task, wherein

the at least one multiplexer is configured to connect ITC data to any processing core of the multiple processing cores to which the local task is assigned for execution for the period of time.

137.    The accused Nitro Card is a **system for processing a set of computer program instances.**

138.    As discussed extensively above, the accused Nitro Cards each have an array of Nitro cores (**processing cores**) handling data packet processing as part of a packet processing pipeline. *See, e.g.*, Ex. 12 at 5; Ex. 13 at 4; Ex. 15 at 17. The Nitro cores execute different data packet processing tasks on each packet flow depending on what is required for that given packet flow (a set of tasks being executed on one or more cores being an example of **a computer program instance** offloaded to the accused Nitro Card hardware for processing). *See, e.g.*, Ex. 12 at 5; Ex. 13 at 4; Ex. 15 at 17.

139.    The accused Nitro Card includes **a plurality of processing stages, at least one of the plurality of processing stages comprising multiple processing cores.**

140.    The Nitro Cards perform data packet processing operations on incoming data packets in sequential, pipeline operations (**processing stages**). *See* Ex. 16 at 2496 ("When a Nitro card handles an inbound network packet, it evaluates the packet against stateful firewall rules and access control lists. It tracks the connection, meters it, and performs other actions as applicable. . . . When a Nitro card handles an outbound network packet, it looks up the remote interface destination, evaluates various VPC functions, applies rate limits, and performs other actions that apply. Then it forwards the packet to its next hop destination on the network."). The nature of the packet processing requires that it be done in **processing stages**. For example, for certain types of

packet flows TCP encapsulation must occur before encryption which must occur before stateful or system wide flow control or load balancing. Other tasks that are done in a pipelined manner include "hashing on that five tuple . . . [for] queue assignment," performing routing data lookup, checking the "network access control list associated with the subnet," performing a security check on the data packet to determine whether to send the packet or allow it into the local host, and performing an IP address lookup. Ex. 18 at 14–15; *see also id.* at 16–18. The stages are collectively a **plurality of processing stages** that permit a successful connection to be established between the source and destination for a given type of data packet and allow accelerated flow of data packets of that type. *Id.* at 19.

141.    The accused Nitro Card handles multiple flows simultaneously, each requiring processing by the Nitro Card and each being allotted a share of cycle time for the Nitro Processor Nitro cores (Nitro cores in the accused Nitro Cards comprising **multiple processing cores**). *See* Ex. 18 at 55–70 (showing "multiple flows . . . at the instance level."). At least some of the time multiple Nitro cores are performing the same packet processing task on different flows (via different program instances) at the same time. In such situations, the cores performing the same processing task (e.g., TCP encapsulation) is an example of a stage (**at least one . . . processing stage[] comprising multiple processing cores**).

142.    The accused Nitro Card is configured such that **each given task of a plurality of tasks of a given program instance of the set of program instances is hosted at a different stage of the plurality of processing stages as a local task of the given program instance at the respective stage, and for at least one of the multiple processing cores of a given processing stage of the plurality of processing stages, a local task of one of the program instances is assigned as an active task instance for execution for a period of time.**

143.    **As discussed above, programs** are sets of **tasks** that are carried out on **processing cores**, and the accused Nitro Cards run **program instances** that include **local tasks of the given program instance at the respective stage**, including evaluating data packets against firewall rules and access control lists, tracking and metering connections, performing routing lookups, setting up and performing VPC functions, applying rate limits, hashing for queue assignment, and performing security checks. *See* Ex. 16 at 2496; Ex. 18 at 14–18. Each **program instance** includes one or more of the various **local tasks**.

144.    A particular program (series of packet processing tasks) running on a particular set of processing cores processing a particular data packet is a **program instance**. The Nitro cores in each stage of the pipelines are **processor cores**, and there are **multiple processor cores** in each of the **plurality of processing stages,** with the **multiple processor cores** configured to perform the stage-specific **task of a given program instance**. In one example, in the Nitro System a first stage performs a first complex packet processing operation (e.g., a stateful TCP operation or packet inspection), a second stage performs encryption, and a third stage performs a system-wide load balancing operation. Each **task of a given program instance** runs on a particular **processing core** configured to execute that task on a particular type of data packet. In the accused Nitro Cards, the software **programs** running on the Nitro cores include **processing tasks** to be performed on each data packet. *See* Ex. 18 at 55–70. The **tasks** to be performed on a data packet are assigned to **processing cores (at least by virtue of the core being identified to handle a given packet flow)**, and each core hosts **a local task of one of the program instances** of the packet processing pipeline. *Id.*

145.    In the accused Nitro Card, data packets are passed to Nitro **cores** in a given **stage (**when multiple pipelined steps or stages are required for the given packet flow). Each **core** in a

stage at least temporarily (**for a period of time**) hosts the required packet processing operation (**a local task** of the packet processing **program instance)** that **is assigned** a given data packet flow (**an active task instance**) for **execution**. To effectuate the foregoing the Nitro Card assigns cores to process individual packet flow (perform **individual tasks**, each task being one of the **tasks** of the **program**).

146.    The accused Nitro Card includes **a group of multiplexers each connecting inter-task communications (ITC) data to a respective stage of the plurality of processing stages, wherein at least one multiplexer of the group of multiplexers is a hardware resource dedicated to the local task.**

147.    The SoC network provides physical hardware **multiplexers** between each Nitro core and multiple buffers containing ITC data, **each connecting inter-task communications (ITC) data to a respective stage of the plurality of processing stages**. Each stage buffers ITC data in the shared SoC system level cache, which is segmented into flow-specific buffers. Through the SoC network (**cross-connect**), each Nitro core is able to access all the flow specific buffers (**task-specific memory segments**) associated with a given stage in the system cache through the SoC network. Each buffer is connected to each Nitro core through a mesh network or equivalent (which comprises a **group of multiplexers**). Any **inter-task communications (ITC) data** generated during a processing stage is written to a flow-specific buffer, and buffers holding the ITC data from one stage are accessible by each core instantiating subsequent processing stages. Each core, therefore, is associated with a **multiplexer** in the SoC network **hardware resource** that is **dedicated to the local task** because each core performs its own local processing task.

148.    The accused Nitro Card includes **at least one multiplexer configured to connect ITC data to any processing core of the multiple processing cores to which the local task is**

**assigned for execution for the period of time**.

149.    As discussed immediately above, the SoC network provides the connections between the ITC buffers and the Nitro cores, including **multiplexer connections** from each buffer with **ITC data** requiring processing of a specific **local task** to the set of Nitro cores handling that **local task (any processing core of the multiple processing cores to which the local task is assigned).** Through the SoC network or equivalent (**cross-connect** with **multiplexers**), each buffer can be connected to any Nitro core if permitted by the Nitro controller (e.g., if permissible in view of packet flow isolation requirements). The core to which a buffer is connected will be hosting a packet processing task required for the packet flow **(to any processing core of the multiple processing cores to which the local task is assigned for execution for the period of time).**

150.    Further, in a stage with a **local task** with parallel processing, there are **multiple processing cores to which the local task is assigned for execution for the period of time**. *See* Ex. 18 at 70–71, 77 (showing cycle times allotted to Nitro cores for executing processes **for a period of time**). In at least some circumstances, the packet processing programs executed on the Nitro core array include **multiple processing cores** in at least one stage (**the local task**), providing for parallel processing.

151.    In sum, the SoC network connects **ITC data** in the **task-specific memory segments**, from each stage of processing cores that execute a particular task of a program to the next stage, as described above. ITC data from one stage is passed on to **any processing core … to which the local task is assigned for execution for the period of time**, i.e., any Nitro core that is configured for processing the next stage task. Each particular Nitro core **to which the local task is assigned** receives ITC data through a **multiplexer configured to connect ITC data to** the particular Nitro core. The Nitro core that receives the ITC data executes the **local task** until the

processing is complete (**for a period of time**). The SoC network hardware **connects ITC data** after the task of the first stage of processing is complete to a Nitro core configured for processing the next stage task (**any processing core . . . to which the local task is assigned for execution for the period of time**).

152.    Claim 3 recites:

> The system of claim 1, further comprising:
>
> a set of source task specific buffers each for buffering data destined for a respective task of the plurality of tasks of the given program instance located at a given stage of the plurality of processing stages; and
>
> hardware logic for forming a hardware signal indicating whether sending ITC data is presently permitted to a given buffer of the source task specific buffers, wherein the hardware signal is formed based at least in part on a fill level of the given buffer, and the hardware signal is provided for a particular task of the plurality of tasks for which the given buffer is specific to.

153.    The accused Nitro Card includes **a set of source task specific buffers each for buffering data destined for a respective task of the plurality of tasks of the given program instance located at a given stage of the plurality of processing stages.**

154.    In the accused Nitro Card, incoming data packets are sorted into input buffers, which are per-pipeline or per-flow, i.e., dedicated to a distinct set of data packet processing instructions (**a set of source task specific buffers for a respective task . . . of the given program instance**). *See* Ex. 18 at 54 (showing Nitro Processing by "unique" "flow hashes" for "independent [] assignment" of data to a "queue" and Nitro processor), 71 (showing Nitro Processor cycle time allotted between instances). Different packet flows require a different set of processing tasks, and each data packet is at least implicitly sorted into its buffer based on the particular set processing tasks required by that data packet type **at a given stage of a plurality of processing stages**. The **input buffers** are thus **task-specific** memory segments. Each of these input buffers is a **buffer for**

**buffering data destined for a task** performed in the associated **processing stage** in a **program instance**. *Id.*

155.    The accused Nitro Card includes **hardware logic for forming a hardware signal indicating whether sending ITC data is presently permitted to a given buffer of the source task specific buffers, wherein the hardware signal is formed based at least in part on a fill level of the given buffer, and the hardware signal is provided for a particular task of the plurality of tasks for which the given buffer is specific to.**

156.    The Nitro controller executes queue depth management, traffic control and fair queuing. Ex. 18 at 32–33. This controller is instantiated in hardware, as is the remainder of the Nitro card (**hardware logic for forming a hardware signal indicating whether sending ITC data is presently permitted to a source task specific buffer**). The congestion controls prohibit packets from being sent to the buffer based on the depth of the queue on how full the queue is (**signal is formed based at least in part on a fill level of the source task specific buffer**). As discussed above, the buffers are task specific because they are unique to each packet flow, each of which requires given packet processing tasks (**provided for a particular task . . . for which the given buffer is specific to**).

157.    The above allegations of infringement are preliminary and are therefore subject to change.

158.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '353 patent no later than the filing of this Complaint.

159.    At least since the date that Defendant learned of the '353 patent, Defendant's infringement has been deliberate and willful.

160.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '353 patent, Defendant's infringement, as well as the infringement of their customers and others.

161.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '353 patent.

162.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '353 patent.

163.    Defendant has directly infringed and continues to directly infringe the '353 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the AWS Nitro System or components and services thereof.

164.    Defendant's infringement of the '353 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

165.    Defendant's infringement of the '353 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

166.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '353 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

167.    Defendant's infringement of the '353 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

168.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Five without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT SIX
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,318,353

169.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

170.    Defendant knew it was infringing the '353 patent no later than the date it received this Complaint.

171.    In addition to directly infringing the '353 patent, as discussed above with respect to Count Five, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '353 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

172.    Defendant knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '353 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '353 patent with the AWS Nitro System, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Defendant in an infringing manner

through direct communications, training and support materials, and customer support regarding how to configure and use the AWS Nitro System, by advertising and promoting the use of the AWS Nitro System in an infringing manner, and distributing development kits, development Amazon Machine Images, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the AWS Nitro System must be used. *See, e.g.*, Exs. 9, 14–19.

173.    Defendant has had actual knowledge of the indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

174.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '353 patent.

175.    Defendant's infringement of the '353 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

176.    Defendant's infringement of the '353 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

177.    Defendant's infringement of the '353 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '353 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

178.    Defendant's infringement of the '353 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

179.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Six without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

**COUNT SEVEN**
**DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,133,599**

180.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

181.    On November 20, 2018, the United States Patent and Trademark Office duly and legally issued the '599 patent, titled "Application Load Adaptive Multi-stage Parallel Data Processing Architecture." *See* Ex. 4.

182.    Mark Sandstrom is the sole and true inventor of the '599 patent.

183.    ThroughPuter owns all rights, title, and interest to and in the '599 patent.

184.    On information and belief, Defendant has and continues to infringe one or more claims of the '599 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the accused Nitro Cards.

185.    Claim 1 of the '599 patent is representative of the claims infringed by Defendant and recites:

1.    A system including processors and comprising a plurality of subsystems, implemented on hardware logic and/or software logic executing on the processors, for dynamic resource management of a pool of processing resources on behalf of application programs, the system comprising:

a first subsystem configured to periodically allocate a plurality of processing units of the pool of processing resources among a plurality of application programs over time, wherein the plurality of processing units comprises units of at least two types of processing units and/or units of a reconfigurable type, and allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs;

a second subsystem configured to, for each program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period, and each instance of the set of highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a relative readiness for execution among the one or more instances of the respective application program; and

a third subsystem configured to assign, for each of the plurality of application programs, the respective set of highest priority instances to a subset of the processing units allocated by the first subsystem for the respective application program for execution during an upcoming allocation period, wherein, for at least a portion of instances of at least a portion of the plurality of application programs, a respective instance of the respective set of highest priority instances is associated with a processing unit type or configuration, wherein assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance, and prioritizing placement of the respective instance to the particular type or configuration processing unit demanded;

wherein the system is further configured to periodically adjust allocations of the plurality of processing units of the pool of processing resources over time, wherein, for each periodic adjustment, the adjusting is followed by the selecting and the assigning.

186.    The accused Nitro Card is a **system including processors and comprising a plurality of subsystems, implemented on hardware logic and/or software logic executing on**

**the processors, for dynamic resource management of a pool of processing resources on behalf of application programs**.

187.    As discussed above, the accused Nitro Card handles multiple packet flows simultaneously, each requiring processing by the Nitro Card and each being allotted a share of cycle time for the Nitro Processor (**system including processors**, e.g., Nitro cores and specialized processing hardware). *See* Ex. 18 at 70. The accused Nitro Card handles multiple flows the Nitro processing resources among the flows, and allowing some flows additional Nitro processing resources when needed for a time through a credit-based system allowing increased processing bandwidth as needed for an instance until the credit allotment for that instance is exhausted. *Id.* at 55–70 (showing "multiple flows . . . at the instance level" and discussion the accumulation and consumption of bandwidth credits.). This is an example of **dynamic resource management of a pool of processing resources** (e.g., Nitro cores) **on behalf of application programs** (e.g., the packet processing programs run on the Nitro cores). *Id.*; *see also* Ex. 16 at 2499. The accused Nitro Card also includes **plurality of subsystems, implemented on hardware logic and/or software logic executing on the processors**, as described below.

188.    The accused Nitro Card includes **a first subsystem configured to periodically allocate a plurality of processing units of the pool of processing resources among a plurality of application programs over time, wherein the plurality of processing units comprises units of at least two types of processing units and/or units of a reconfigurable type, and allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs.**

189.    The accused Nitro Card includes at least **two types of processing units**, namely the Nitro cores, encryption engines and specialized packet processing hardware. *See, e.g.*, Ex. 9 at 7 ("Nitro Cards are dedicated hardware components with powerful 64-bit processing capabilities [Nitro cores] and specialized Application Specific Integrated Circuits ('ASICs') that operate independently from the system main board that runs all customer compute environments, including code and data processing operations.") (emphasis removed); *id.* at 11 (the accused Nitro Cards "implement data encryption for networking and storage using hardware offload engines with secure key storage integrated in the SoC"); Ex. 21 at 20 (showing the accused Nitro Card for VPC including traffic shaping "limiters"); *see also* Ex. 9 at 8 ("The critical control firmware on the Nitro Cards can be live-updated [**periodically**], using cryptographically signed software packages.").

190.    The live updating of the critical control firmware (**a first subsystem**) on the accused Nitro Cards at least sometimes causes **reallocating the plurality of processing units among the plurality of application programs**, for example, application programs having new features and security updates. Such reallocation is necessary to maintain throughput as packet flows in the data center change over time with respect to the advanced protocols or encryption used to create and handle them (e.g., connection tracking, packet inspection, session and overlay management, flow control and load balancing). In the accused Nitro Cards, the critical control firmware is configured to **periodically** (at least as often as the live-updating) **allocate a plurality of processing units of the pool of processing resources** (nitro cores) **among the plurality of application programs** from one program (and its set of processing tasks) to another program (and its set of processing tasks) **over time** based on the processing demands and processing allotment, and the encryption processing units are **periodically** (at least as often as the live-updating)

**allocated among the plurality of application programs** based on **increased processing demands** (e.g., for encryption) by the application programs in a manner consistent with any priority weighting assigned to the application programs (**allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs**). *See* Ex. 18 at 65–71 (each program instance is allotted "protected resources" for Nitro processing [**processing resource quota of each program**] and additional "[C]ycle [T]ime [A]llotted for [E]ach Nitro [P]rocessor" can be increased due to data bursts [**processing demand of each of the plurality of application programs**]); *see also* Ex. 16 at 2499.

191.    The accused Nitro Card includes **a second subsystem configured to, for each program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period, and each instance of the set of highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a relative readiness for execution among the one or more instances of the respective application program**.

192.    The accused Nitro Card enforces packet-per-second allowances on a per flow basis and opportunistic allocation for high priority flows. Ex. 18 at 69–70. The allowances are a form of **priority** and the Nitro controller (the **second subsystem**) allocates Nitro cores and encryption engines (**two types of processing units**) to process the various packet flows as discussed above on a time-multiplexed manner based at least in part on the allowances for each flow (**for each**

program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period). The higher allowance flows (highest priority instances) will be given (assigned) a higher percentage of the cycle times of the processing units. The amount of cycle time each flow receives (is assigned) is based in part on the number of processing units available to perform the required tasks and whether the flow has been associated with a queue and has data ready to process (each instance of the set of highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a relative readiness for execution among the one or more instances of the respective application program).

193.     Further, the opportunistic allocation also satisfies this claim element. The Nitro card allows acceleration of **higher priority flows** beyond their packet-per-second allowance if there are cores cycles available to do so (**for each program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period**). Ex. 18 at 69–70. In opportunistic allocation, the choice of which flows will get this extra cycle time will be based in part on the number of processing units available to perform the required tasks (if there are not any processing units available for the task in question there is no extra cycle time available) and whether the flow has been associated with a queue and has data ready to process (**each instance of the set of highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a**

**relative readiness for execution among the one or more instances of the respective application program**).

194.    The accused Nitro Card includes **a third subsystem configured to assign, for each of the plurality of application programs, the respective set of highest priority instances to a subset of the processing units allocated by the first subsystem for the respective application program for execution during an upcoming allocation period, wherein, for at least a portion of instances of at least a portion of the plurality of application programs, a respective instance of the respective set of highest priority instances is associated with a processing unit type or configuration, wherein assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance, and prioritizing placement of the respective instance to the particular type or configuration processing unit demanded**.

195.    The accused Nitro Card includes packet processing hardware that assigns the packet flows based on fixed rate allocation or opportunistic allocation (as discussed immediately above) to the appropriate processing unit (**a third subsystem configured to assign the respective set of highest priority instances to a subset of the processing units allocated by the first subsystem for the respective application program for execution during an upcoming allocation period**). Ex. 18 at 69–71. The control hardware ensures that the processing units which are allocated or opportunistically allocated to process a packet flow are allowed to perform the packet processing tasks required (based on the allocation) and can be configured to perform the task (e.g., an encryption engine performs encryption tasks and Nitro cores would not be used for more complex tasks) (**wherein, for at least a portion of instances of at least a portion of the plurality of**

application programs, a respective instance of the respective set of highest priority instances is associated with a processing unit type or configuration, wherein assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance). *Id.* Consistent with this, the controller ensures that each flow is actually assigned to a processing unit of the type that executes the packet processing task(s) required for that given packet flow (**and prioritizing placement of the respective instance to the particular type or configuration processing unit demanded**). *Id.*

196.    The accused Nitro Card **is further configured to periodically adjust allocations of the plurality of processing units of the pool of processing resources over time, wherein, for each periodic adjustment, the adjusting is followed by the selecting and the assigning**.

197.    As network traffic changes over time, the Nitro **System is configured** (automatically or at the direction of a network programmer) to **periodically adjust allocations of the plurality of processing units of the pool of processing resources over time** at least as demand for the different types of processing units changes. For example, the **periodic adjustment** of the allocations of Nitro cores and encryption hardware processing time results in a new allocation of the Nitro cores and encryption processing unit. The **selecting** follows the adjustment at least because selecting the highest priority instances is based in part on the number of processing units allocated to an application program, which changes upon adjusting. The **assigning** also follows the **adjustment** and **selecting** at least because after the **periodic adjustment,** a different set of processing units is generally available for assigning than before.

198.    The above allegations of infringement are preliminary and are therefore subject to change.

199.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '599 patent no later than the filing of this Complaint.

200.    At least since the date that Defendant learned of the '599 patent, Defendant's infringement has been deliberate and willful.

201.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '599 patent, Defendant's infringement, as well as the infringement of their customers and others.

202.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '599 patent.

203.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '599 patent.

204.    Defendant has directly infringed and continues to directly infringe the '599 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, and importing in this District and elsewhere in the United States, and importing into the United States, the Nitro System or components and services thereof.

205.    Defendant's infringement of the '599 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

206.    Defendant's infringement of the '599 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

207.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '599 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

208.    Defendant's infringement of the '599 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

209.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Seven without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

**COUNT EIGHT**
**INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,133,599**

210.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

211.    Defendant has known that it is infringing the '599 patent no later than the date it received this Complaint.

212.    In addition to directly infringing the '599 patent, as discussed above with respect to Count Seven, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '599 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

213.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '599 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '599 patent with the accused Nitro Card, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the accused Nitro Card in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the accused Nitro Card, by advertising and promoting the use of the accused Nitro Card in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the accused Nitro Card must be used. *See, e.g.*, Exs. 9, 14–19.

214.    Defendant has had actual knowledge of the indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

215.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '599 patent.

216.    Defendant's infringement of the '599 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

217.    Defendant's infringement of the '599 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

218.    Defendant's infringement of the '599 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of

infringement of the '599 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

219.    Defendant's infringement of the '599 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

220.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Eight without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT NINE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,310,902

221.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

222.    On June 4, 2019, the United States Patent and Trademark Office duly and legally issued the '902 patent, titled "System and Method for Input Data Load Adaptive Parallel Processing." *See* Ex. 5.

223.    Mark Sandstrom is the sole and true inventor of the '902 patent.

224.    ThroughPuter owns all rights, title, and interest to and in the '902 patent.

225.    On information and belief, Defendant has and continues to infringe one or more claims of the '902 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the accused Nitro Cards.

226.    Claim 1 of the '902 patent is representative of the claims infringed by Defendant

and recites:

1.  A system, executing on at least one of hardware logic and software logic executing on a plurality of processors, for hosting a plurality of application programs, the system comprising:

a plurality of processing data input buffers, each input buffer of the plurality of processing data input buffers queuing data for a corresponding instance of one program of the plurality of application programs, wherein each program of the plurality of programs comprises a plurality of instances;

an array of cores of computing capacity;

a first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs, wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers, and a respective processing quota of each application program of at least a portion of the plurality of application programs, and allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs;

a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program, wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum number of the plurality of instances, and the plurality of selected instances is selected based at least in part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program, and according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores; and

a third subsystem configured, according to the controlling, to establish direct data access from each input buffer of at least a subset of the plurality of processing data input buffers to the respective core of the array of cores that is assigned to a given corresponding instance of the program for which the respective input buffer is queuing data;

wherein the array of cores is periodically allocated by the first subsystem and assigned by the second subsystem based at least in part on changes in respective

volumes of processing data associated with each program of the plurality of application programs.

227.    The accused Nitro Card is a **system, executing on at least one of hardware logic and software logic executing on a plurality of processors, for hosting a plurality of application programs**. The accused Nitro Card includes specialized packet processing **hardware and software logic** and an array of Nitro cores (**plurality of processors**) for processing data packets. *See, e.g.*, Ex. 9 at 7; Ex. 18 at 14; Ex. 16 at 2499. The Nitro cores handling data packet processing **host a plurality of application programs** (for example, executing packet processing instructions). *See, e.g.*, Ex. 9 at 7; Ex. 18 at 14; Ex. 16 at 2499.

228.    The accused Nitro Card includes **a plurality of processing data input buffers, each input buffer of the plurality of processing data input buffers queuing data for a corresponding instance of one program of the plurality of application programs, wherein each program of the plurality of programs comprises a plurality of instances**.

229.    The accused Nitro Card includes a SoC system level cache segmented into input buffers. *See* Ex. 18 at 14 (showing the accused Nitro Card "Hash on 5-tuple" for "Queue Assignment" resulting in the Nitro "Processor Assignment."); Ex. 16 at 2499. Specialized packet processing hardware determines what processing is needed for each packet based on data packet metadata, then demultiplexes the packets from the pipeline flow into input buffers, which are segments of the system level cache designated for holding data packets for processing (**plurality of processing data input buffers . . . queuing data for a corresponding instance of one program**). Ex. 18 at 14. As discussed above, each input buffer is specific to a distinct data packet processing flow (and thus program) for processing by the Nitro core array such that data packets requiring processing by an input buffer-specific program are routed to the input buffers corresponding to that specific program (**input buffers queuing data for a corresponding**

instance of one program). *Id*. Each **program . . . comprises a plurality of instances** because programs can comprise a single task and thus when multiple cores are performing the same packet processing task (program) there are multiple instances of that program being executed on the core array.

230.    As discussed above, the accused Nitro Card includes an array of Nitro cores, which is **an array of cores of computing capacity.** *See* Ex. 12 at 5; Ex. 13 at 4; Ex. 15 at 17.

231.    The accused Nitro Card includes **a first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs, wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers, and a respective processing quota of each application program of at least a portion of the plurality of application programs, and allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs**.

232.    As discussed above, the live updating of the critical control firmware on the accused Nitro Cards at least sometimes causes reallocating the plurality of processing units among the plurality of application programs, for example, application programs having new features and security updates. Such reallocation is necessary to maintain throughput as packet flows in the data center change over time with respect to the advanced protocols or encryption used to create and handle them (e.g., connection tracking, packet inspection, session and overlay management, flow control and load balancing). In the accused Nitro Cards, Nitro cores are periodically (at least as often as the live-updating) allocated among the plurality of application programs from one program (and its set of processing tasks) to another program (and its set of processing tasks) based on the

processing demands and the encryption processing units are periodically (at least as often as the live-updating) allocated among the plurality of application programs based on increased processing demands (e.g., for encryption) by the application programs in in a similar manner (**wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers**). Further, in the Nitro System each packet flow (each associated with a program instance as discussed above) is allotted "protected resources" and the reallocation will at least implicitly take this into account **(and a respective processing quota of each application program of at least a portion of the plurality of application programs).** *See* Ex. 18 at 70. At least some of the time multiple cores are allocated or allowed to perform the same operation for the same period of time, and because a program can comprise a single packet processing task the **allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs**. The Nitro controller is thus the **first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs**.

233.    The accused Nitro Card includes **a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program, wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum number of the plurality of instances, and the plurality of selected instances is selected based at least in**

**part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program, and according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores**.

234.    As discussed above, the accused Nitro Card includes specialized hardware (**second subsystem**) that routes data packets from incoming data packet streams into input buffers for processing by Nitro cores, with each input buffer associated with one or more Nitro cores allocated to a program for processing data packets from that input buffer (**a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program**). *See* Ex. 18 at 54 (showing Nitro Processing by "unique" "flow hashes" for "independent [] assignment" of data to a "queue" and Nitro processor), 71 (showing Nitro Processor cycle time allotted between instances).

235.    As discussed above, the Nitro card sometimes has excess or unused bandwidth that is opportunistically allocated, which demonstrates that at least some of the time the system does not have all core cycles fully employed hosting packet processing tasks for the various packet flows. Therefore, at least some of the time, not all of the allocated core are used (**wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum number of the plurality of instances**). Ex. 18 at 69–70.

236.    As discussed above, the Nitro controller implements fair scheduling and congestion mitigation algorithms at the queues, and the controller will assign packet flows to cores accordingly. Packet flows are assigned to cores (and/or given core cycle time) based in part on how much congestion that packet flow is experiencing (**and the plurality of selected instances is selected based at least in part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program**). Ex. 18 at 32–33.

237.    As also discussed above, the Nitro controller ensures that each flow-specific buffer is connected to the appropriate core at the appropriate time (**according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores**).

238.    The accused Nitro Card includes **a third subsystem configured, according to the controlling, to establish direct data access from each input buffer of at least a subset of the plurality of processing data input buffers to the respective core of the array of cores that is assigned to a given corresponding instance of the program for which the respective input buffer is queuing data, wherein the array of cores is periodically allocated by the first subsystem and assigned by the second subsystem based at least in part on changes in respective volumes of processing data associated with each program of the plurality of application programs.**

239.    In the accused Nitro Card, the SoC network hardware is an example **a third subsystem configured . . . to establish direct data access from each input buffer . . . to the respective core . . . that is assigned to a given corresponding instance of the program for which the respective input buffer is queuing data**. As discussed above, the SoC network connects the buffers to the cores with a mesh network or equivalent. Ex. 18 at 14, 54; Ex. 16 at

2499. It forms the physical connections for **direct data access** from the **input buffer** to its **respective** Nitro **core**. As discussed above, in operation each input buffer is specific to a particular Nitro core or set of Nitro cores, with each core processing data packets in its associated input buffer according to that core's processing instructions. *See* Ex. 16 at 2496; Ex. 20. As network traffic changes over time, the **first subsystem periodically reallocates the array of cores** (and/or cycle time on the cores) to packet flows (each associated with a program instance) based at least on tracking and telemetry data to mitigate congestion (**based at least in part on changes in respective volumes of processing data associated with each program of the plurality of application programs).** Ex. 16 at 2496.

240.    The above allegations of infringement are preliminary and are therefore subject to change.

241.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '902 patent no later than the filing of this Complaint.

242.    At least since the date that Defendant learned of the '902 patent, Defendant's infringement has been deliberate and willful.

243.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '902 patent, Defendant's infringement, as well as the infringement of their customers and others.

244.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '902 patent.

245.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '902 patent.

246.    Defendant has directly infringed and continues to directly infringe the '902 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, and importing in this District and elsewhere in the United States, and importing into the United States, the Nitro System or components and services thereof.

247.    Defendant's infringement of the '902 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

248.    Defendant's infringement of the '902 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

249.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '902 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

250.    Defendant's infringement of the '902 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

251.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Nine without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

**COUNT TEN**
**INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,310,902**

252.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

253.    Defendant has known that it is infringing the '902 patent no later than the date it received this Complaint.

254.    In addition to directly infringing the '902 patent, as discussed above with respect to Count Nine, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '902 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

255.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '902 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '902 patent with the accused Nitro Card, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the accused Nitro Card in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the accused Nitro Card, by advertising and promoting the use of the accused Nitro Card in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the accused Nitro Card must be used. *See, e.g.*, Exs. 9, 14–19.

256.    Defendant has had actual knowledge of its indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

257.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '902 patent.

258.    Defendant's infringement of the '902 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

259.    Defendant's infringement of the '902 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

260.    Defendant's infringement of the '902 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '902 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

261.    Defendant's infringement of the '902 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

262.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Ten without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## PRAYER FOR RELIEF

WHEREFORE, ThroughPuter respectfully requests that the Court enter judgment against Defendant as follows:

A.     An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '078 patent;

B.     Entry of judgment declaring that Defendant's infringement of the '078 patent is willful;

C.     An order permanently enjoining Defendant from further infringement of the '078 patent;

D.     An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '065 patent;

E.     Entry of judgment declaring that Defendant's infringement of the '065 patent is willful;

F.     An order permanently enjoining Defendant from further infringement of the '065 patent;

G.     An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '353 patent;

H.     Entry of judgment declaring that Defendant's infringement of the '353 patent is willful;

I.     An order permanently enjoining Defendant from further infringement of the '353 patent;

J.     An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '599 patent;

K.    Entry of judgment declaring that Defendant's infringement of the '599 patent is willful;

L.    An order permanently enjoining Defendant from further infringement of the '599 patent;

M.    An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '902 patent;

N.    Entry of judgment declaring that Defendant's infringement of the '902 patent is willful;

O.    An order permanently enjoining Defendant from further infringement of the '902 patent;

P.    An award of damages pursuant to 35 U.S.C. § 284;

Q.    An order that the damages award be increased up to three times the actual amount assessed, pursuant to 35 U.S.C. § 284;

R.    An award to ThroughPuter of its costs, pre- and post-judgment interest, and reasonable expenses to the fullest extent permitted by law;

S.    A declaration that this case is exceptional pursuant to 35 U.S.C. § 285, and an award of attorneys' fees and costs; and

T.    An award to ThroughPuter of such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ThroughPuter hereby demands a trial by jury on all issues so triable.

Dated:  October 7, 2025

Respectfully submitted,

*/s/ Alexis L. Ritzer*

Alexis L. Ritzer
TX Bar No. 24115116
aritzer@ga-iplaw.com
Greg Gardella (to be admitted *pro hac vice*)
ggardella@ga-iplaw.com
Cook Alciati (to be admitted *pro hac vice*)
calciati@ga-iplaw.com
**GARDELLA ALCIATI P.A.**
80 M Street SE, 1st Floor
Washington D.C. 20003
Telephone: (703) 556-9600
Facsimile: (703) 740-4541

*Attorneys for Plaintiff ThroughPuter, Inc.*